

FIL[..]
FIRST JUDICIAL
DISTRICT COURT

2016 JAN 13 PM 3: 50

1
Complaint

MIKE HOOD, IN PRO PER
352 STATE ROAD 76
SANTA CRUZ, NM 87567
Tel: (505) 670-0378
Email: mike@hoodcorporation.com

Attorneys for Plaintiff in Pro Per

**First Judicial District Court of New Mexico**

**County of Santa Fe**

| | |
|---|---|
| Mike Hood, <br><br>      Plaintiff, <br><br> vs. <br><br> TEXAS FARMERS INSURANCE COMPANY, <br><br> FIRE INSURANCE EXCHANGE by Fire <br><br> Underwriters Association, Attorney-in-Fact; <br><br> FARMERS INSURANCE EXCHANGE by <br><br> Farmers Underwriters Association, Attorney-in-Fact; Fire Insurance Exchange, Farmers <br><br> Insurance Exchange, ~~Kim Gardetto,~~ Bruce <br><br> Litman, and DOES 1 to 50, <br><br>      Defendants. | Case No.: D-101-CV-2016-00092 <br><br> **COMPLAINT FOR DAMAGES FOR** <br><br> **1.   Breach of Contract** <br> **2.   Insurance Bad Faith** <br> **3.   Breach of Fiduciary Duties** <br> **4.   Violation of the Trade Practices and Frauds Act, NMSA 1978 §§ 59A-16-1 to -30** <br> **5.   Violation of the Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -24 (1967, as amended through 2003) (the UPA** |

1. Plaintiff brings this action on behalf of himself and all others similarly situated against Farmers Group, Inc., doing business as Farmers Underwriters Association ("FGI"), Fire Insurance Exchange ("FIE"), Mid-Century Insurance Company ("MCI"), Texas Farmers Insurance, Kim Gardetto (Claims Supervisor), and Bruce Litman (Claim Unit Supervisor) and Does 1 through 50 (hereinafter referred to collectively and inclusively, including the Doe Defendants, as "Farmers" or "Defendants").

EXHIBIT A

2.     Plaintiff hereby alleges as follows:breach of contract, breach of the covenant of good faith and fair dealing (bad faith), breach of fiduciary duties, violation of the Trade Practices and Frauds Act, NMSA 1978, §§ 59A-16-1 to -30 (1984, as amended through 2003), contained in the New Mexico Insurance Code (the Insurance Code), and violation of the Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -24 (1967, as amended through 2003) (the UPA).

3.     The defendants and each of them are jointly and severally liable and/or are liable based on their comparative fault as joint venturers, co-conspirators, agents, and/or aided and abetted each other to accomplish the acts complained of herein.

4.     Acting through agreements, contracts, and/or a pattern and practice between defendants and plaintiff, FARMERS defendants direct, handle, administer and adjust insurance claims submitted by policyholders and defendants and/or each any and every one of them was and is liable for all misconduct alleged in the complaint under theories of agency, contracts, agreements, common law and statute.

5.     Defendants and each of them conduct business in New Mexico such that they are subject to the jurisdiction of this State and this State has a compelling interest in protecting its citizens from the predatory, fraudulent, bad faith and otherwise unlawful practices of said defendants.

6.     Defendants may be served with process through the Secretary of State to the extent that each entity does  not maintain a local registered agent for service of process.

7.     This Court has jurisdiction over all causes of action asserted herein, because this case is a cause not given by statute to other trial courts.

8.     Federal jurisdiction does not exist in this case because there is no federal question implicated and each claim for relief does not exceed the federal jurisdictional minimum.

9.     In addition, Defendants have a principal place of business in New Mexico based on transaction volume and contacts with this State as well as within Texas and within California as stated in the subject insurance contract and subscription agreement between plaintiff and defendants and each of them.

10.     This Court has jurisdiction over Defendants because their principal place of business is located in New Mexico, Texas and/or Los Angeles, California and they are authorized to, and do in fact, conduct business in all New Mexico, Texas and California counties and have intentionally availed themselves of the laws and markets of New Mexico, Texas and California through the promotion, marketing, distribution, and sale of insurance in New Mexico, Texas and California.

11.     Venue is proper in this Court because Farmers is located and does substantial business in this county.

12.     Plaintiff, a citizen of New Mexico, rented a residence in Texas, and purchased from Defendants a renter insurance Policy for that property.

13.     Plaintiff is informed and believes that Defendant Farmers Group, Inc. is, and at all relevant times herein mentioned, was a corporation with its principal place of business in New Mexico as well as within Los Angeles, California.

14.     Fire Insurance Exchange is a reciprocal or interinsurance exchange owned by its policy holders and organized under the laws of the State of New Mexico as well as Texas and California. FIE is managed by its attorney-in-fact Fire Underwriters Association.

15.     FIE's principal place of business is 4680 Wilshire Boulevard, Los Angeles, CA 90010, but this company also does substantial business in Santa Fe, New Mexico.

16.     Fire Underwriters Association ("FUA") is the attorney-in-fact of defendant FIE and performs managerial, underwriting, and administrative services for FIE, including drafting policy documents and executing policies on FIE's behalf.

17.     FUA is subject to, regulated by, and required to comply with all of the provisions of the Insurance Code and is liable for the conduct alleged herein. FUA's principal place of business is in Los Angeles, California, but it also has business offices in Santa Fe, New Mexico and Texas. Mid-Century Insurance Company is a corporation organized under the laws of New Mexico, Texas and California.

18.     FGI provides all operating services (including staffing and occupancy) to MCI. FIE

provides claims adjustment services to MCI.  MCI's principal place of business is 4680 Wilshire

Boulevard Los Angeles, CA 90010, but it also has business offices located in New Mexico and

Texas.

19.     The true names and capacities of Defendants sued herein as Does 1 through 50, inclusive,

are presently unknown to Plaintiffs who therefore sue these Defendants by fictitious names.

20.     Plaintiff will amend this Complaint to show the Doe Defendants' true names and

capacities after they become known to Plaintiffs.

21.     Each of the Doe Defendants is legally responsible in some manner for the conduct

alleged herein.

22.     At all times mentioned in the causes of action alleged herein, each and every Defendant,

expressly including the unnamed DOE defendants, was an agent and/or employee of each and

every other Defendant.

23.     In doing the things alleged in this Complaint, each and every Defendant was acting

within the course and scope of their agency or employment and was acting with the consent,

permission, and authorization of each of the remaining Defendants.

24.     All actions of each Defendant, as alleged in this Complaint, were ratified and approved

by every other Defendant or its authorized officers or managing agents.

25.     Plaintiffs is informed and believes that Defendants share the same officers and directors.

In these capacities, the officers and directors of one entity comprise the majority of the other

entities' boards of directors which control and dictate Defendants' policies and practices.

26.     These policies and practices include, but are not limited to: the claims, marketing and

sales, and underwriting practices; insurance policy language; the decision to impose

extracontractual requirements on plaintiffs, and require receipts for all items submitted in

connection with claims for loss of personal property covered by a renter's insurance policy, and

further to deny claims in their entirety, including claims for personal property for which receipts

and sufficient evidence of value and ownership HAVE been produced to defendants.

27.     Plaintiff and policyholders similarly situated are sold policies by defendants and are told that receipts are only required IF the plaintiff, and similarly situated policyholders, have possession of such documentation, but that such evidence is not a condition of payment on loss claims.

28.     Most consumers, similarly situated policyholders, and plaintiff in this case, do not keep or maintain receipts for items of personal property which are purchased and which are insured against loss by theft through a renter insurance policy.

29.     Defendants knew that plaintiff and other similarly situated policyholders are unlikely to keep all of their receipts for items of personal property which they purchase.

30.     In order to sell plaintiff and others policies of insurance which insure a renter's personal property against loss by theft, defendants repeatedly told plaintiff and others similarly situated that they would not have to keep receipts for their items of personal property in order to insure them against loss by theft, but that IF they did have such receipts, they should produce them to defendants in the event of a theft loss claim.

31.     Furthermore, defendants did not tell plaintiff or other policyholders similarly situated that they would deny a claim for loss in connection with a renter's policy if plaintiff or others similarly situated included items in the claim for which plaintiff or other similarly situated did not still have possession of the receipt for the items, even if receipts and satisfactory evidence of value and ownership were provided as to other items listed in the claim.

32.     In the instant case, plaintiff entered into a policy of insurance with defendants and each of them.

33.     The terms of the policy of insurance are attached as Exhibit A to this complaint (the "policy"). The policy does not require plaintiff to keep or maintain receipts for items of personal property in order to be able to claim reimbursement for such items in the event of loss by theft.

34.     The policy is specifically designed to cover loss of personal property by a tenant/renter where such items are stolen from the tenant/renter's residence.

35.     The policy provides that in the case of loss by theft, plaintiff must cooperate with defendants and must produce any receipts, that he HAS for items claimed to have been stolen.

36.     Obviously, plaintiff is not required to produce receipts for items for which he no longer has possession of the receipts.

37.     In or about December 2012, plaintiff's residence in Texas was burglarized and personal property was stolen from plaintiff.

38.     Plaintiff complied with all conditions and obligations of the policy in connection with his claim for loss by theft, including but not limited to giving his recorded statement to defendants, and also by submitting his notarized proof of loss claim and attached police report, inventory of items and other evidence which are attached hereto as Exhibit B.

39.     Defendants, instead of processing plaintiff's claim in a timely and fair manner, and pursuant to the terms of the policy as well as within the parameters of rules, regulations, public policies, good faith, fiduciary responsibilities and other requirements of the State of New Mexico and other jurisdictions as applicable, stalled plaintiff's claim by repeatedly requesting the same information over and over again, by switching claims adjusters so that plaintiff never knew who he was dealing with and had to start over from scratch with each new adjuster assigned to the case, and by failing to return plaintiff's calls.

40.     Defendants indicated that the claim was going to be paid, and repeatedly told plaintiff that they just needed some additional information before the claim could be paid.

41.     But defendants shuffled plaintiff through so many different claims adjusters that plaintiff never knew who he was speaking to, and the claims adjuster never knew the status of plaintiff's case.

42.     This tactic was designed and intended to delay and stall payment of a valid claim, and to

frustrate plaintiff from pursuing any action against defendants by making him believe that if he just cooperated (which he did, at every turn), his valid claim for loss would be paid.

43.     Plaintiff paid all of his premiums when due, and the policy remained in full force and effect and was renewed when plaintiff moved to New Mexico during the pendency of the claim at issue in this case. Defendants renewed the policy with plaintiff and continued to process his claim once plaintiff moved to New Mexico.

44.     Defendants continued to delay, stall and defraud plaintiff after he became a New Mexico resident. In or about March 2015, defendants denied plaintiffs claim in its entirety.

45.     When plaintiff contacted defendants to ask why the claim was denied, defendants, by and through their agent, Kim Gardetto, as well as others, told plaintiff that one of the items included in the loss inventory, a mobile fireplace, did not have a receipt included in the documentation to defendants, and that therefore the entire claim was denied, even as to items for which receipts or other evidence of ownership and value WERE provided.

46.     Plaintiff asked defendant how he could provide receipts for items if he no longer had the receipt in his possession. Gardetto refused to respond.

47.     Plaintiff then requested that Gardetto explain to him why the claim was denied as to items for which plaintiff had provided receipts, bills of sale, or other satisfactory evidence, and Gardetto said the "The Claim is denied."

48.     Plaintiff asked Gardetto where in the insurance policy was there notice to insureds that claims would be denied in their entirety if any items were claimed to have been stolen without providing a receipt, and where in the policy was language that required an insured to have a receipt for every item of personal property covered by the policy.

49.     Plaintiff asked Gardetto to look at the policy but she said she did not have a copy of the policy.

50.     Plaintiff asked Gardetto to reverse the claim denial and pay the claim.

51.     Gardetto just hung up on plaintiff.

52.     Plaintiff called Gardetto's supervisor, defendant Bruce Litman to explain the situation and requested that he reverse the determination and pay the claim.

53.     Litman failed and refused to do so, and never returned plaintiff's call.

54.     Plaintiff requested a written explanation of the denial of his claim and received no further communication from defendants.

55.     As a consequence of the facts pleaded above, there exists at all relevant times, a unity of interest in ownership between Defendants.

56.     These relationships are such that any individuality and separateness between Defendants has never existed and does not exist at the present time.

57.     Plaintiffs are informed and believe and based thereon allege that Defendants are each

alter egos of one another, are agents or principals in agency-principal relationships with one another, and are successors or predecessors of each other and, based thereon, are liable for the acts and omissions of each other.

58.     These alter ego, agent-principal, and successor and predecessor relationships should be recognized to prevent an injustice to Plaintiff and others similarly situated.

59.     An insurance contract is not always treated as an ordinary contract.   *See Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo.2003) (en banc) ("[I]nsurance contracts are not ordinary commercial contracts.").

60.     The relationship between insurer and insured is a special relationship under New Mexico law.   *See Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994).

61.     An insurer owes a duty of good faith and fair dealing to its insured.   *Id.* at 438-39, 872 P.2d at 856-57.

62.     This duty is non-delegable.   *Jessen v. Nat'l Excess Ins. Co.*, 108 N.M. 625, 629, 776 P.2d 1244, 1248 (1989); *see Cary*, 68 P.3d at 466.

63.     It follows that an insurer cannot avoid or dissolve this duty by delegating to third parties its essential function of making sure that claims for policy benefits are handled and determined fairly, promptly, and honestly.   *See id.*

64.     The reasons why courts have recognized the special and unique relationship between insurer and insured include the inherent lack of balance in and adhesive nature of the relationship, *Bourgeous*, 117 N.M. at 439, 872 P.2d at 857, as well as the quasi-public nature of insurance and the potential for the insurer to unscrupulously exert its unequal bargaining power "at a time when the insured is particularly vulnerable." *Wolf*, 50 F.3d at 797.

65.     An insured is particularly vulnerable at the point following a loss when the insured makes a claim for the loss. *See Cary*, 68 P.3d at 467.

66.     Defendants conduct constitutes a violation of the trade practice and frauds portion of the Insurance Code. See §§ 59A-16-1 to -30. Section 59A-16-20 states: the following practices with respect to claims, by an insurer or other person, knowingly committed or performed with such frequency as to indicate a general business practice, are defined as unfair and deceptive practices and are prohibited: not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims[.]

67.     Pursuant to Section 59A-16-1, Section 59A-16-20 applies to adjusters as well as insurers. See § 59A-16-1.

68.     FIE denies claims based on the failure to produce receipts for items of personal property claimed in a loss due to theft for which a policy of renters insurance provides coverage such as the policy at issue in this case with such frequency as to "indicate a general business practice." § 59A-16-20; *see Valles*, 2004-NMCA-019, ¶ 18, 135 N.M. 91, 84 P.3d 1056.

69.     One or more defendants, including defendant [FIE] is a foreign corporation which directs, handles, administers and adjusts all claims submitted by policyholders of [FICA], including plaintiff's claim□ As such, [FIE] is fully liable for any and all errors and misconduct with respect to Plaintiffs['] insurance claim. Consistent with the terms and conditions of the insurance policy, FIE □ was obligated to □ indemnify Plaintiff in an amount of money such that Plaintiff could purchase like kind and comparable personal property to items which were lost based on the cost and value of such items in the local marketplace.

70.     Defendants admitted that items of personal property included in plaintiff's claim were sufficiently documented to support payment of his claim, however, defendants refused to pay all or any portion of plaintiff's claim and denied it in its entirety, because of plaintiff's inability to produce a receipt for a single item (mobile fireplace), and despite the fact that plaintiff even produced a picture of the item in its location when it was stolen from plaintiff's trailer at his residence at the time, as well as documentation of the item's value from the store (though not contemporaneous with his purchase, since plaintiff, like almost every other person in the world does not keep, or even receive from the seller in many cases, receipts for every item he purchases).

71.    [FIE's] failure and refusal to promptly provide the correct insurance coverage to Plaintiff pursuant to Plaintiff's insurance contract, was willful and failed to provide the insurance coverage contracted for.

72.    Further, at the time of Plaintiffs' claim, FIE had a contract and an ongoing relationship with a loss valuation company that FIE knew offered "lower than a fair actual cash value or replacement value of an insured's total loss, and claims adjusters imposed requirements on insureds which are not set forth in the contract of insurance.

73.    Section 57-12-2(D) defines an unfair trade practice as: a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person and includes failure to deliver the quality or quantity of goods or services contracted for[.]

74.    Thus, a plaintiff must prove four elements in order to establish a violation of the UPA: (1) the defendant made a false statement, (2) the defendant made the statement in connection with the "sale of services" and knew that the statement was false, (3) the defendant made the statement in the regular course of trade or commerce, and (4) the statement was one which "may, tends to, or does[ ] deceive or mislead any person." *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991) (internal quotation marks and citations omitted).

### First Cause of Action: Breach of Contract

75.    Paragraphs 1-74 are incorporated herein by reference.

76.    Plaintiff and defendants entered into a contract of insurance the terms of which are attached at Exhibit A.

77.    Defendants conduct set forth above in denying plaintiff's claims in their entirely caused plaintiff to suffer damages in excess of this Court's minimum jurisdictional threshold.

78.    Defendants are liable and plaintiff requests all available relief including interest, penalties, attorneys' fees and other relief as available. Plaintiff requests relief as set forth below.

## Second Cause of Action: Breach of the Covenant of Good Faith and Fair Dealing

79.     Paragraphs 1-78 are incorporated herein by reference.

80.     A covenant of good faith and fair dealing is implied by law as an element of every insurance contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.

81.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit and intent of the parties' bargain.  The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

82.     As alleged above, Farmers failed to disclose the meaning of, or the method of processing claims so as to REQUIRE a receipt for every item claimed to have been stolen and submitted in connection with a claim for loss by theft under a renter insurance policy such as the policy at Exhibit A.

83.     The implied covenant of good faith and fair dealing imposed on Farmers an obligation to use an "objectively reasonable" method of claim adjustment and processing, and one which does not impose extra-contractual requirements on the claimant, such as a requirement to keep a receipt for every item of personal property the insured intends to be covered by the policy and which defendants represent WILL be covered by the policy.

84.     Plaintiffs are informed and believe that defendants claims policies and practices as set for the above are objectively unreasonable in light of policyholders' legitimate expectations and result in the denial of valid claims.

85.     In addition, Farmers violated the implied covenant of good faith and fair dealing by knowingly misleading plaintiff, imposing terms that were not in the contract, shuffling adjusters so plaintiff always had a new adjuster unfamiliar with the case and defendants agents shifted responsibility and stalled and delayed plaintiff's claim.

86.     Plaintiffs did all, or substantially all, of what the contracts, i.e. Policies, required of them.

87.     Plaintiffs has sustained damages as a result of Farmers' breach of the covenant of good faith and fair dealing.

88.   Plaintiff requests relief as set forth below.

## Breach of Fiduciary Duty

89.   Paragraphs 1-87 are incorporated herein by reference.

90.   Defendants and each of them owed plaintiff fiduciary duties as imposed by law based on their relationship of insured and insurer.

91.   As such, defendants had to deal with plaintiff fairly, honestly and in plaintiff's best interest.

92.   As set forth above, defendants breached their fiduciary responsibilities to plaintiff by denying his claim unfairly, failing to pay benefits, failing to property process plaintiff's claim and otherwise as set forth above and as will be proven at trial.

93.   Plaintiff requests relief as set forth below.

## Violation of Trade Practices and Frauds Act

94.   Paragraphs 1-93 are incorporated herein by reference.

95.   Defendants' conduct constituted a violation of the Trade Practices and Frauds Act, NMSA 1978 §§ 59A-16-1 to -30.

96.   Plaintiff was damaged thereby and requests relief as set forth below.

## Violation of the Unfair Practices Act

97.   Paragraphs 1-96 are incorporated herein by reference.

98.   Defendants conduct above constitutes a Violation of the Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -24 (1967, as amended through 2003).

99.   Plaintiff was damaged thereby and requests relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court enter a judgment against Defendants and each of them, including all Doe Defendants that:

A.   Declares that Farmers' conduct, as detailed above, violates the law, and that permanently enjoins Farmers from engaging in the conduct;

B.   Awards Plaintiff the costs to investigate and prosecute this lawsuit, and reasonable attorneys' fees and expenses.

C. Awards pre-judgment and post-judgment interest at the legal rate;

D. Awards equitable monetary relief, including restitution of all ill-gotten proceeds, and the imposition of a constructive trust upon Farmers, or otherwise restricts Farmers from transferring the ill-gotten monies to ensure that Plaintiff has an effective remedy;

E. Awards restitution sufficient to prevent Farmers from being unjustly enriched at the expense of Plaintiff and to provide for return of the benefits Farmers unjustly obtained from Plaintiffs as alleged herein;

F. Awards damages for breach of contract as alleged herein;

G. Awards damages for breach of the implied covenant of fair dealing as alleged herein;

H. Affords such other and further legal and equitable relief as this Court may deem just and proper.


## JURY DEMAND

Plaintiff requests trial by jury on all such triable issues.


Dated:  December 31, 2015


By:

_____
Mike Hood, Plaintiff in Pro Per

12/31/2015

Non-Assessable

## YOUR BROAD FORM HOMEOWNERS TENANT POLICY
# TEXAS

Farmers Insurance Group of Companies®
4680 Wilshire Boulevard, Los Angeles, California 90010

Dear Customer:

The member Companies and Exchanges of the Farmers Insurance Group of Companies would like to take this opportunity to say "Thank You" for your recent business.

Your needs for insurance protection are very important to us. We are committed to providing you with the best customer service at the lowest cost possible.

If you haven't already done so, please take a moment to review your policy to assure you understand the coverages. This is a very important document that you'll want to keep in a safe place.

If you have any questions regarding your policy or if you would like information about other coverages, feel free to contact me.

Again, thank you for choosing us for your insurance protection. We look forward to serving you.

Sincerely,

*ANN MCBRIDE*

Your Farmers® Agent

(972) 241-7766

http://www.farmersinsurance.com

6-98

L1008101

# Exchange Update

Dear Fellow Fire Insurance Exchange Member,                                                                Los Angeles, April 1, 2012

2011 was a good year for the Fire Insurance Exchange. Fire Insurance Exchange is an insurer within the Farmers Insurance Group®, a group that includes two other Exchanges, and other subsidiaries and affiliates of all three Exchanges. The insurers within the Farmers Insurance Group provide automobile, homeowners, personal umbrella, and business owners insurance.

## Recent Developments

- Farmers' nationally acclaimed University of Farmers® once again received high recognition, placing second in this year's Top 125 Training Awards for corporate training. This follows last year's number one ranking. This prestigious award reflects our goal to provide the best value and experience for every customer we are privileged to serve.
- To provide additional protection against today's digital threats, Cyber Liability coverage will be endorsed to certain business owners' policies in 2012.
- MySafetyPoint has been enhanced to provide more comprehensive information on how to control losses and improve safety.
- Farmers is continuing its introduction of *eSignature* in 2012 so that customers have an easy way to electronically sign their insurance forms. *eSignature* is simplifying the insurance buying process for customers.
- Farmers Insurance Group continues to expand geographically into additional Eastern states that include Maryland, New Jersey and into Georgia in 2012. This is a positive development for the Exchange policyholders, as spreading risks geographically means that a single disaster has less impact on the Exchange.

## Community Involvement

Farmers® invests in educational, safety and charitable programs for the benefit of a diverse cross-section of Americans. Through its various corporate sponsorships, such as the PGA TOUR's Farmers Insurance Open℠, Farmers works with its charitable partner, the Century Club of San Diego, to support several children's charities and programs for the military. One beneficiary is "Blessings in a Backpack," a program which distributes backpacks filled with food to low-income school children as they head home for the weekend. Farmers also sponsors local high school athletics, high school bands going to the Tournament of Roses Parade, and a multitude of public safety events across the country. Farmers continues to be a leading corporate contributor to the March of Dimes, a national organization dedicated to improving the health of babies.

## Your Voting Rights

As a member of Fire Insurance Exchange, you have the right to vote for representatives of the Exchange Board of Governors. Attached is a proxy form for your vote in our 2013 Annual Meeting of Members of Fire Insurance Exchange. You may vote in person at the meeting or you may appoint a proxy to act on your behalf by executing and returning this proxy form. Additional information on Fire Insurance Exchange can be found in the FAQs on the other side of this page.

## Privileged to Serve

For more than eight decades, Farmers Insurance Group has provided its customers with coverage options for their insurance needs. Every day, we strive to deliver the best value and experience to every customer we're privileged to serve. Farmers appreciates your business and looks forward to continuing to earn your confidence for many years to come.

Sincerely,

*Dale A. Marlin*

Dale A. Marlin
Chair of the Board of Governors of Fire Insurance Exchange

*You may return this form with your premium payment, or send it separately to the following address:*

**FIRE INSURANCE EXCHANGE**
P.O. BOX 51196
LOS ANGELES, CA 90051-5496

25-4097   4-12                                                                                                                      A4097E01

DETACH AND RETURN THIS PORTION ONLY



**P r o x y**

FARMERS

**01) Alan R. Gildemeister,** Schaumburg, IL
Mr. Gildemeister is co-founder, President and CEO of a machine tool manufacturing company he has developed and expanded. He has had a 36 year career in sales, sales management, and business ownership and leadership within the machine tool industry.

**02) Frederick R. Kruse,** Fort Myers, FL
Mr. Kruse is a retired banking and finance executive, who served as President and CEO of a federally chartered financial institution. He has extensive financial management experience, and sales and marketing expertise.

**03) Gerald A. McElroy,** LaQuinta, CA
Mr. McElroy has had an international business career with broad-based experience in a diversity of industries. Since 1997 his firm has provided advisory financial services to growth oriented companies. He is a Certified Public Accountant, and is active in various professional organizations.

### Fire Insurance Exchange
*Proxy for Annual Meeting of Members*

Each policyholder is entitled to vote at the 2013 Annual Meeting of Members of Fire Insurance Exchange (the "Annual Meeting"). You may vote in person at the meeting or you may appoint a proxy to act on your behalf by executing and returning this proxy form. You may revoke your proxy at any time before it is voted at the Annual Meeting by submitting a written notice of revocation to the address on the reverse hereof or by filing a duly executed proxy bearing a later date. Your proxy will not be voted if you are present at the Annual Meeting and choose to vote in person.

Policyholders are being asked to vote upon the election of the following Class 1 Nominees to the Board of Governors of Fire Insurance Exchange. If elected, the Class 1 Nominees will serve on the Board of Governors through the 2017 Annual Meeting.

The undersigned hereby appoints Jeffrey J. Dailey and Doren E. Hohl, and each of them, with full power to act without the other and with full power of substitution, as the true and lawful attorneys and proxies of the undersigned, to attend the Annual Meeting of Members of Fire Insurance Exchange to be held at 4700 Wilshire Boulevard, Los Angeles, California, on Monday, March 18, 2013 at 10:00 A.M., and any adjournments thereof, and to vote with all powers the undersigned would possess as a member of Fire Insurance Exchange if personally present. The proxy, when properly executed, will be voted in the manner directed herein by the undersigned policyholder. If no specification is made, this proxy will be voted "For All" of the nominees listed.

**THIS PROXY FORM IS VALID ONLY WITH SIGNATURE, DATE AND POLICY NUMBER.**

**ITEM 1. ELECTION OF GOVERNORS.**
The Board of Governors recommends a vote "For All" of the Class 1 Nominees.

| | For All | Withhold All | For All Except |
|---|---|---|---|
| Class 1 Nominees: 02) Frederick R. Kruse | ☐ | ☐ | ☐ |
| 01) Alan R. Gildemeister   03) Gerald A. McElroy | | | |
| *(Please select only one box)* | | | |

To withhold authority to vote for any individual nominee(s), mark "For All Except" and write the number(s) or name(s) of the nominee(s) on the line below.

_____

**ITEM 2. OTHER BUSINESS.** In their discretion, the Proxies are authorized to vote upon such other business as may properly come before the meeting, or any adjournment thereof.

Signature (Please sign your name exactly as it appears on your Premium Notice)          Date          Policy Number (Required)

25-4097   4-12          A4097E01

# Frequently asked questions

As a member of Fire Insurance Exchange, we want you to understand the basics of the operation of an Exchange because, as you will see below, you are an owner of the Exchange.

### What is an Exchange?

An Exchange is an insurance organization which operates in most ways like any other insurance company. But there are a few differences. Fire Insurance Exchange was organized under a provision in the California Insurance Code which allows insureds to "exchange" policies with other insureds. Because the insureds cannot practically be involved in actually issuing policies, collecting premium, paying commissions to agents, etc., they appoint a third party - called an "attorney-in-fact" (AIF) - to perform those duties on their behalf for a fee. That appointment is made through a document called a "Subscription Agreement." You were asked to sign a Subscription Agreement at the time you applied for insurance with Fire Insurance Exchange and that is how you became a member (aka subscriber).

### Who owns the Exchange?

You do. Subscribers of the Exchange are owners until such time as they no longer have insurance from the Exchange. Subscribers elect a Board of Governors which supervises the financial affairs of the Exchange and the performance of the AIF in conformity with the Subscription Agreement terms.

### Why is an AIF fee paid to Fire Underwriters Association (FUA)?

Under the Subscription Agreement mentioned above, members appoint FUA to perform certain of the tasks, such as policy issuance and collection of premium, which are involved in running an insurance operation. The Subscription Agreement specifies an AIF fee of 25 percent of premium although FUA has taken less than that amount.

### What is FUA?

FUA is a wholly owned subsidiary of Zurich Financial Services, Ltd (ZFS), a Swiss company. FUA and ZFS have no ownership interest in Fire Insurance Exchange, which is owned by its subscribers (insureds).

### How was your premium dollar spent by Fire Insurance Exchange in 2011?

Your premium dollar covers Exchange costs including losses incurred, acquisition costs, taxes, license fees, the AIF fee, and any contributions to surplus. For 2011, the AIF fee was 13.0 percent of the premium dollar, which included the AIF profit of 6.83 percent of the premium dollar for that year. The results of the Fire Insurance Exchange were impacted by the large number of catastrophe losses but the company still maintained a strong capital base with surplus of $653 million.

### Can the Exchange lose money?

If premiums collected exceed claims payments and other expenses (including the fee for the AIF), then the Exchange retains those net premium earnings (as contributions to surplus). If premiums are not sufficient to cover claims and expenses, the Exchange will lose money. That's one reason it is important to build a cushion against possible future losses. The AIF does not participate in claims losses and does not enjoy any net premium earnings. Importantly, subscribers are not responsible for any losses the Exchange might suffer.

### Where can I get more information about the Exchange?

You can go to *www.farmers.com/about* for most questions. If you have additional questions, please contact:

Subscriber Relations Office
Fire Insurance Exchange
Attn: Corporate Secretary
P.O. Box 51161
Los Angeles, CA 90051-5461

**YOU MAY RETURN THIS FORM WITH YOUR PREMIUM PAYMENT,
OR SEND SEPARATELY TO THE FOLLOWING ADDRESS:**

**FIRE INSURANCE EXCHANGE**
P.O. BOX 51196
LOS ANGELES, CA 90051-5496

BROAD FORM HOMEOWNERS TENANT
FIRE INSURANCE EXCHANGE, LOS ANGELES, CALIFORNIA
A Reciprocal Company

**SUPPLEMENTAL
INFORMATION**

| POLICY NUMBER | POLICY PERIOD | |
|---|---|---|
| | EFFECTIVE DATE | EXPIRATION DATE |
| 96280-52-77 | 09-21-2012 | 09-21-2013 |

AT 12:01 A.M. STANDARD TIME AT THE LOCATION
OF THE RESIDENCE PREMISES/DWELLING

Account number:   M087339343

**DECLARATIONS REFLECT:**

NEW BUSINESS

**CREDITS**

NON SMOKER DISCOUNT HAS BEEN APPLIED TO YOUR POLICY.

**MESSAGES**

INSURED PAYS PREMIUM.
IN THE EVENT OF A LOSS, AT ANY TIME, CALL US AT 1-800-HELPPOINT (1-800-435-7764)

**NAMED INSURED AND MAILING ADDRESS:**

MIKE HOOD

1115 GOLDEN GATE DR
CARROLLTON TX  75007-5059

Mortgagee's or Other Interest's policy mailed to:

**ADDITIONAL MORTGAGEE OR OTHER INTEREST(S):**

**POLICY ACTIVITY**

| $ | Previous Balance | |
|---|---|---|
| 367.00 | Premium | |
| 25.00 | Fees * | |
| | Payments or Credits | |
| $ NONE | Total * | |
| INSURED PAYS | | |

ANY "TOTAL" BALANCE OR CREDIT $7.00 OR
LESS WILL BE APPLIED TO YOUR NEXT BILLING.
BALANCES OVER $7.00 ARE DUE UPON RECEIPT.

* SEE ADDITIONAL FEE
INFORMATION BELOW

Keep with your policy showing the same policy number as this endorsement.

Effective Date: **09-21-2012**      **ADDITIONAL ENDORSEMENT(S)**      96280-52-77
Policy Number of the Company
designated in the Declarations

---

### Additional Fee Information

The "Fees" identified in the "Policy Activity" section above apply on a per-policy, not an account basis. The following additional fees also apply.

In consideration of our agreement to allow you to pay in installments, the following service fee(s) will apply:

For the Monthly Recurring Electronic Funds Transfer (EFT) and fully enrolled in on-line billing (paperless) option, a service charge of $0.00   per installment is applied per account.

For other Monthly EFT payment plans, a service charge of $2.00   per installment is applied per account.

For all payment plans other than those listed above, a service charge of $5.00   per installment is applied per account for each installment of $105.00 or more and a service charge of $3.00   is applied per account for each installment of less than $105.00.

If your account is for the payment of premiums on more than one policy, any change in these fees will not be effective until the updated service fee information is provided for each of the policies.

In addition, the following fees also apply:

LATE FEE: $10.00  (applied per account)

RETURNED PAYMENT CHARGE: $25.00  (applied per each check, electronic transaction or other remittance which is not honored by your financial institution for any reason including but not limited to insufficient funds or a closed account)

REINSTATEMENT FEE: $25.00   (applied per policy)

One or more of the fees or charges described above may be deemed a part of premium under applicable law.

56-5290 10-11                                                                 C5290512

## QUICK REFERENCE - TEXAS HOMEOWNERS TENANT POLICY - FORM B

Insuring Agreement ———————— 3
Definitions ———————————— 3

### SECTION I - PROPERTY COVERAGE

Coverage B
   Personal Property ———————— 4
   Personal Property Off Premises ——— 4
Special Limits of Liability —————— 4
Property Not Covered ———————— 4
Extensions of Coverage
   Debris Removal ————————— 5
   Loss of Use —————————— 5
   Reasonable Repairs ———————— 5
   Property Removed ———————— 5
   Consequential Loss ———————— 5
   Improvements, Alterations and
   Additions —————————— 5
   Automatic Removal ———————— 5
Perils Insured Against
   Coverage B (Personal Property) ——— 5
Exclusions ————————————— 6
Deductible ————————————— 7
Section I - Conditions
   Insurable Interest and Limit of Liability — 7
   Residential Community Property Clause — 7
   Duties After Loss ———————— 7
      **Your Duties After Loss** ————— 7
      Our Duties After Loss—————— 7
   Loss Settlement ————————— 8
   Loss to a Pair or Set ———————— 8
   Salvage Rights ————————— 8
   Appraisal ——————————— 8
   Loss Payment —————————— 8
   Catastrophe Claims ———————— 8
   Other Insurance ————————— 8
   Suit Against Us ————————— 8

Abandonment of Property —————— 8
No Benefit to Bailee ———————— 8

### SECTION II - LIABILITY COVERAGE

Coverage C (Personal Liability) ——— 9
Coverage D (Medical Payments to Others) — 9
Exclusions
   Coverage C and D Exclusions ——— 9
   Coverage C Exclusions —————— 10
   Coverage D Exclusions —————— 11
Additional Coverages
   Claim Expenses ————————— 11
   Imperative Medical Expenses to Others —— 11
   Damage to Property of Others ———— 11
Section II - Conditions
   Limit of Liability————————— 11
   Severability of Insurance —————— 12
   **Duties After Loss** ——————— **12**
   Duties of an Injured Person ———— 12
   Payment of Claim under Coverage D — 12
   Suit Against Us ————————— 12
   Bankruptcy of the Insured ————— 12
   Other Insurance ————————— 12
   Notice of Settlement of Liability Claim——— 12

### POLICY CONDITIONS
### APPLYING TO SECTIONS I AND II

Policy Period ——————————— 12
Concealment or Fraud ——————— 13
Liberalization Clause ———————— 13
Waiver or Change of Policy Provisions — 13
Cancellation ————————————— 13
Refusal to Renew ————————— 13
Assignment —————————————— 13
Subrogation ————————————— 14
Death ——————————————— 14

### YOUR DUTIES AFTER A LOSS

**SECTION I:**
1. Protect the property from further damage.
2. Give prompt written notice to the company.
3. Call the police if a law has been broken.
4. Make a list of all damaged personal property, including costs.
5. If requested, obtain proof of loss form from your agent or the company and submit within 91 days of the request.

**SECTION II:**
1. Do not make any voluntary payments except for first aid to others at the time of the accident.
2. Give written notice to agent or company, including details about the accident and any witnesses.
3. Send copies of legal notices you receive to the company.
4. Help the company get the necessary information to make settlement.

FOR A COMPLETE LIST OF YOUR DUTIES SEE PAGES  **7**  AND  **12**  OF YOUR POLICY.

**Prescribed by the Texas Department of Insurance
Homeowners Tenant Form B - Effective July 8, 1992
(Revised January 1, 1996)**

THIS PAGE INTENTIONALLY
LEFT BLANK.

## HOMEOWNERS TENANT FORM B

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown on the declarations page and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. In addition certain words and phrases are defined as follows:

1. **"Bodily injury"** means bodily harm, sickness or disease. This includes required care, loss of services and death that results.

2. **"Business"** includes trade, profession or occupation.

3. **"Business day"** when used in this policy means a day other than a Saturday, Sunday or holiday recognized by the state of Texas.

4. **"Insured"** means you and residents of your household who are:

   a. Your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II Liability. **"insured"** also means:

   c. any person or organization legally responsible for animals or watercraft to which this policy applies. You or a person included in 4.a. or 4.b. above must own the animal or watercraft. A person or organization using or having custody of these animals or watercraft without consent of the owner is not an **insured.**

   d. With respect to any vehicle to which this policy applies:

   (1) any employee of an **insured** while engaged in the employment of the **insured;** or

   (2) any other person using the vehicle on an **insured location** with your consent.

5. **"Insured location"** means:

   a. the **residence premises.**

   b. the part of other premises, other structures and grounds you use as a residence and:

   (1) which is shown on the declarations page; or

   (2) which you acquire during the policy period for your use as a residence.

   c. any premises you use in connection with a premises in 5.a. or 5.b. above.

   d. any part of a premises:

   (1) not owned by an **insured;** and

   (2) where an **insured** is temporarily residing.

   e. vacant land, other than farm land, owned by or rented to an **insured.**

   f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured.**

   g. individual or family cemetery plots or burial vaults of an **insured.**

   h. any part of a premises occasionally rented to an **insured** for other than **business** use.

6. **"Occurrence"** means an accident, including exposure to conditions, which results in **bodily injury** or **property damage** during the policy period.

7. **"Property damage"** means injury to, destruction of, or loss of use of property.

8. **"Residence employee"** means an employee of an **insured** who performs duties related to the ownership, maintenance or use of the **residence premises,** including maintenance or use of a motor vehicle. This includes employees who perform similar duties elsewhere for an **insured.** This does not include employees while performing duties related to the **business** of an **insured.**

9. **"Residence premises"** means the **residence premises** shown on the declarations page. This includes the one or two family dwelling, including other structures, and grounds where an **insured** resides or intends to reside within 60 days after the effective date of this policy.

## SECTION I PROPERTY COVERAGE

## COVERAGE B (PERSONAL PROPERTY)

We cover:

1. a. personal property owned, worn or used by an **insured** while on the **residence premises.** This includes window or wall air conditioning units.
   b. at your request, property of others while the property is on the part of the **residence premises** occupied by an **insured.**
2. a. personal property owned, worn or used by an **insured** anywhere in the world.
   b. at your request, personal property of a **residence employee** when:

   (1) the property is away from the **residence premises** of the **residence employee** and in the control of the **residence employee;** and
   (2) while the **residence employee** is performing work for you.

   Our total limit of liability under 2.a. and 2.b. above is 10% of the Coverage B (Personal Property) limit of liability or $1,000, whichever is greater. This is additional insurance and does not reduce the Coverage B (Personal Property) limit of liability.

**SPECIAL LIMITS OF LIABILITY.** These limits do not increase the Coverage B (Personal Property) limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. Money/Bank Cards. $100 on money or numismatic property or loss by theft or unauthorized use of bank fund transfer cards registered to an **insured.**
2. Bullion/Valuable Papers. $500 on gold or silver bullion, manuscripts, notes, securities, stamps, philatelic property, accounts, bills, deeds, evidences of debt, letters of credit, passports, documents, transportation or other tickets.
3. Jewelry/Watches/Furs.  $500 for loss by theft of gems, watches, jewelry or furs.
4. **Business** Personal Property. $2,500 on **business** property.

   We do not cover any **business** property:
   a. that consists of samples or articles for sale or delivery; or
   b. if the property is away from the **residence premises.**

**PROPERTY NOT COVERED.** We do not cover:

1. articles separately described and specifically insured by this or other insurance.
2. animals or birds.
3. motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment.
   However, we do cover such vehicles which are not subject to motor vehicle registration and are:
   a. devices and equipment for assisting the handicapped.
   b. power mowers.
   c. golf carts.
   d. vehicles or machines used for recreational purposes while located on the **residence premises.**
   e. farm equipment not designed for use principally on public roads.
4. trailers, semi-trailers or mobile homes.
   However, we do cover:
   a. trailers and semi-trailers that are designed for use principally off public roads.
   b. boat trailers while on the **residence premises.**
5. aircraft meaning any device used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.
6. watercraft, including outboard motors and furnishings or equipment.
   We do cover watercraft, including outboard motors and furnishings or equipment, while located on land on the **residence premises.**
7. property of roomers or tenants.
8. property usually rented to others off the **residence premises.**

## EXTENSIONS OF COVERAGE.

1. **DEBRIS REMOVAL.** We will pay your expense for the removal from the **residence premises** of:
   a. debris of covered property if a Peril Insured Against causes the loss.
   b. a tree that has damaged covered property if a Peril Insured Against causes the tree to fall.
   This does not increase the limit of liability that applies to the damaged property.

2. **LOSS OF USE.** If a loss caused by a Peril Insured Against under Section I makes the **residence premises** wholly or partially untenantable, we cover:
   a. additional living expense, meaning any necessary and reasonable increase in living expense you incur so that your household can maintain its normal standard of living.
   b. fair rental value, meaning the fair rental value of that part of the **residence premises** usually rented to others by you, less any expenses that do not continue.
   The total limit of liability for all loss of use is 20% of the Coverage B (Personal Property) limit of liability. This is additional insurance and does not reduce the Coverage B (Personal Property) limit of liability. The deductible clause does not apply to loss of use coverage.
   Payment will be for the reasonable time required to repair or replace the damaged property. If you permanently relocate, payment will be for the reasonable time required for your household to become settled.
   The periods of time for loss of use are not limited by expiration of this policy.

3. **REASONABLE REPAIRS.** If a Peril Insured Against causes the loss, we will pay the reasonable cost you incur for necessary repairs made solely to protect covered property from further damage. This coverage does not increase the limit of liability that applies to the property being repaired.

4. **PROPERTY REMOVED.** We pay for expense and damage incurred in the removal of covered property from an **insured location** endangered by a Peril Insured Against. This coverage exists on a pro rata basis for 30 days at each location to which such property is removed for preservation. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

5. **CONSEQUENTIAL LOSS.** We insure:
   a. property contained in a building on the **residence premises** against loss due to change in temperature as a direct result of physical damage to the dwelling, or any equipment contained in the dwelling, caused by a Peril Insured Against. The deductible clause does not apply to this coverage.
   b. property contained in a building on the **residence premises** against a loss due to change in temperature as a direct result of physical damage to any power, heating or cooling equipment (including connections and supply pipes) not contained in or on the dwelling, caused by a Peril Insured Against.
   The total limit of liability for the coverage described in 5. b. above is $500. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

6. **IMPROVEMENTS, ALTERATIONS AND ADDITIONS.** If you are not the owner of the premises, we cover improvements, alterations or additions you have made to the premises for an amount not to exceed 10% of the Coverage B (Personal Property) limit of liability. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

7. **AUTOMATIC REMOVAL.** If you move from the **residence premises** shown on the declarations page to another location within the United States, to be occupied as your principal residence, we cover:
   a. the personal property under Coverage B (Personal Property) at each location in the proportion that the value at each location bears to the total value of all the personal property covered under Coverage B (Personal Property).
   b. property in transit up to 10% of the Coverage B (Personal Property) limit of liability or $1,000, whichever is greater.
   We provide coverage for only 30 days from the date the removal begins.

# SECTION I PERILS INSURED AGAINST
# COVERAGE B (PERSONAL PROPERTY)

We insure against physical loss to the property described in Section I Property Coverage, Coverage B (Personal Property) caused by a peril listed below, unless the loss is specifically excluded. The exclusions contained in this section do not apply to an ensuing loss caused by fire or explosion except as specifically provided.

1. **Fire and Lightning.**
   We do not cover loss to electrical appliances devices, or wiring caused by electricity, other than lightning.

2. **Sudden and Accidental Damage from Smoke.**
   We do not cover loss caused by smog or by smoke from industrial or agricultural operations.
3. **Windstorm, Hurricane and Hail.**
   Coverage under these perils does not include:
   a. loss to cloth awnings, greenhouses and their contents, buildings or structures located wholly or partially over water and their contents.
   b. loss to radio and television towers, outside satellite dishes, masts and antennas, including lead-in wiring, windchargers and windmills.
   c. loss to personal property contained in a building unless direct force of wind or hail makes an opening in a roof or wall and rain, snow, sand or dust enters through this opening and causes the damage.
4. **Explosion.**
5. **Aircraft and Vehicles.**
6. **Vandalism and Malicious Mischief.**
7. **Riot and Civil Commotion.**
8. **Collapse of Building** or any part of the building.
9. **Accidental Discharge, Leakage or Overflow of Water or Steam** from within a plumbing, heating or air conditioning system or household appliance.
10. **Falling Objects.**
    This peril does not include loss to property contained in the building unless the roof or outside wall of the building is first damaged by the falling objects.
11. **Freezing** of plumbing, heating and air conditioning systems and household appliances.
    We do not cover loss caused by or resulting from freezing while the building is unoccupied unless you have used reasonable care to:
    a. maintain heat in the building; or
    b. shut off the water supply and drain plumbing, heating and air conditioning systems of water.
12. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.
    We do not cover loss of the following property by theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen:
    a. personal property while away from the **residence premises** at any other residence owned by, rented to or occupied by an **insured,** except while an **insured** is temporarily living there.
    b. building materials and supplies not on the **residence premises.**

## SECTION I EXCLUSIONS

1. **WATER DAMAGE.**
   We do not cover loss caused by or resulting from flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water or spray from any of these whether or not driven by wind.
   We do cover ensuing loss by fire or explosion.
   We do cover ensuing loss by theft or attempted theft or any act or attempted act of stealing.
2. **GOVERNMENTAL ACTION.**
   We do not cover loss caused by the destruction of property by order of governmental authority.
   But we do cover loss caused by the acts of destruction ordered by governmental authority taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.
3. **BUILDING LAWS.**
   We do not cover loss caused by or resulting from the enforcement of any ordinance or law regulating the construction, repair or demolition of a building or structure.
4. **WAR DAMAGE.**
   We do not cover loss resulting directly or indirectly from war. This includes undeclared war or civil war, insurrection, rebellion or revolution, warlike act by military personnel, destruction or seizure or use for military purpose, and any consequence of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**5. NUCLEAR DAMAGE.**

We do not cover loss resulting directly or indirectly  from nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused. We cover direct loss by fire resulting from nuclear reaction, radiation or radioactive contamination.

**6.  MOLD, FUNGI OR OTHER MICROBES.**

We do not cover loss caused by or resulting from mold, fungi or other microbes.

This exclusion does not apply to an ensuing loss caused by fire, smoke, or explosion.

However, we do cover ensuing mold, fungi or other microbial losses caused by or resulting from sudden and accidental discharge, leakage or overflow of water if the sudden and accidental discharge, leakage or overflow of water loss would otherwise be covered under this policy.

Sudden and accidental shall include a physical loss that is hidden or concealed for a period of time until it is detectable. A hidden loss must be reported to us no later than 30 days after the date you detect or should have detected the loss.

For purposes of this exclusion, ensuing mold, fungi or other microbial losses covered under this policy include reasonable and necessary repair or replacement of property covered under Coverage A (Dwelling) and/or Coverage B (Personal Property).

We do not cover the cost for remediation, including testing of ensuing mold, fungi or other microbes. We do not cover any increase in expenses for Loss of Use and/or Debris Removal due to remediation and testing of ensuing mold, fungi or other microbes.

Remediation means to treat, contain, remove or dispose of mold, fungi or other microbes beyond that which is required to repair or replace the covered property physically damaged by water. Remediation includes any testing to detect, measure or evaluate mold, fungi or other microbes and any decontamination of the **residence premises** or property.

## SECTION I DEDUCTIBLE

**DEDUCTIBLE CLAUSE 3.** The amount shown on the declarations page for Deductible Clause 3 will be deducted from the total amount of each loss under Coverage B (Personal Property).

If a single event causes loss by windstorm, hurricane, hail or wind driven rain and loss by lightning, the deductible will apply only once.

## SECTION I CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Residential Community Property Clause.** This policy, subject to all other terms and conditions, when covering residential community property, as defined by state law, shall remain in full force and effect as to the interest of each spouse covered, irrespective of divorce or change of ownership between the spouses unless excluded by endorsement attached to this policy, until the expiration of the policy or until cancelled in accordance with the terms and conditions of this policy.

3. **Duties After Loss.**

   a. **Your Duties After Loss.** In case of a loss to covered property caused by a perils insured against, you must:

      (1) give prompt written notice to us of the facts relating to the claim.

      (2) notify the police in case of loss by theft.

      (3) (a) protect the property from further damage.

           (b) make reasonable and necessary repairs to protect the property.

           (c) keep an accurate record of repair expenses.

      (4) furnish a complete inventory of damaged personal property showing the quantity, description and amount of loss. Attach all bills, receipts and related documents which you have that justify the figures in the inventory.

      (5) as often as we reasonably require:

           (a) provide us access to the damaged property.

           (b) provide us with pertinent records and documents we request and permit us to make copies.

           (c) submit to examination under oath and sign and swear to it.

(6) send to us, if we request, your signed sworn proof of loss within 91 days of our request on a standard form supplied by us. We must request a signed sworn proof of loss within 15 days after we receive your written notice, or we waive our right to require a proof of loss. Such waiver will not waive our other rights under this policy.

    (a) This proof of loss shall state, to the best of your knowledge and belief:

        (i)   the time and cause of loss.

        (ii)  the interest of the **insured** and all others in the property involved including all liens on the property.

        (iii) other insurance which may cover the loss.

        (iv) the actual cash value of each item of property and the amount of loss to each item.

**b. Our Duties After Loss:**

    (1) Within 15 days after we receive your written notice of claim, we must:

        (a) acknowledge receipt of the claim.

            If our acknowledgement of the claim is not in writing, we will keep a record of the date, method and content of our acknowledgement.

        (b) begin any investigation of the claim.

        (c) specify the information you must provide in accordance with "Your Duties After Loss" (item 3.a. above).

            We may request more information, if during the investigation of the claim such additional information is necessary.

    (2) After we receive the information we request, we must notify you in writing whether the claim will be paid or has been denied or whether more information is needed:

        (a) within 15 business days; or

        (b) within 30 days if we have reason to believe the loss resulted from arson.

    (3) If we do not approve payment of your claim or require more time for processing your claim, we must:

        (a) give the reason for denying your claim; or

        (b) give the reasons we require more time to process your claim. But, we must either approve or deny your claim within 45 days after requesting more time.

**4. Loss Settlement.**

Our limit of liability and payment for covered losses under Section I will not exceed the smallest of the following:

a. the actual cash value at the time of loss determined with proper deduction for depreciation;

b. the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or

c. the specified limit of liability of the policy.

**5. Loss to a Pair or Set.** In case of loss to an item which is part of a pair or set, the measure of loss shall be a reasonable and fair proportion of the total value of the pair or set. The importance of the item will be considered in assessing the loss. Such loss will not be considered a total loss of the pair or set.

**6. Salvage Rights.** If we notify you that we will pay your claim or part of your claim, the notice must also state whether we will or will not take all or any part of the damaged property. We must bear the expense of our salvage rights.

**7. Appraisal.** If you and we fail to agree on the actual cash value, amount of loss, or cost of repair or replacement, either can make a written demand for appraisal. Each will then select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a district court of a judicial district where the loss occurred. The two appraisers will then set the amount of loss, stating separately the actual cash value and loss to each item.

If the appraisers fail to agree, they will submit their differences to the umpire. An itemized decision agreed to by any two of these three and filed with us will set the amount of the loss. Such award shall be binding on you and us.

Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally.

8. **Loss Payment.**
   a. If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you.
   b. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

9. **Catastrophe Claims.**
   If a claim results from a weather related catastrophe or a major natural disaster, each claim handling deadline shown under the Duties After Loss and Loss Payment provisions is extended for an additional 15 days.
   Catastrophe or major natural disaster means a weather related event which:
   a. is declared a disaster under the Texas Disaster Act of 1975; or
   b. is determined to be a catastrophe by the State Board of Insurance.

10. **Other Insurance - Section I.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

11. **Suit Against Us.** No suit or action can be brought unless the policy provisions have been complied with. Action brought against us must be started within two years and one day after the cause of action accrues.

12. **Abandonment of Property.** There can be no abandonment of property to us.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage for the benefit of a person or organization holding, storing or moving property for a fee.

## SECTION II LIABILITY COVERAGE

## COVERAGE C (Personal Liability)

If a claim is made or a suit is brought against an **insured** for  damages because of **bodily injury** or **property damage** caused by an **occurrence** which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include pre-judgment interest awarded against the **insured;** and
2. provide a defense at our expense by counsel of our choice even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.

## COVERAGE D (Medical Payments to Others)

We will pay the necessary medical expenses incurred or medically determined within three years from the date of an accident causing **bodily injury.** Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household. This coverage does apply to **residence employees.** As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured.**
2. to a person off the **insured location,** if the **bodily injury:**
   a. arises out of a condition on the **insured location** or the ways immediately adjoining.
   b. is caused by the activities of an **insured.**
   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured.**
   d. is caused by an animal owned by or in the care of an **insured.**

## SECTION II EXCLUSIONS

1. Coverage C (Personal Liability) and Coverage D (Medical Payments to Others) do not apply to:
   a. **bodily injury** or **property damage** which is caused intentionally by or at the direction of the **insured.**
   b. **bodily injury** or **property damage** arising out of or in connection with a **business** engaged in by an **insured.** But this exclusion does not apply to activities which are ordinarily incidental to non-business pursuits.

c. **bodily injury** or **property damage** arising out of the rental or holding for rental of any part of any premises by an **insured.** This exclusion does not apply to the rental or holding for rental of **an insured location:**

    (1) on an occasional basis if used only as a residence.

    (2) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders.

    (3) in part, as an office, school or studio.

    (4) if the rental is for not more than three car spaces or stalls in garages or stables.

d. **bodily injury** or **property damage** arising out of the rendering of or failure to render professional services.

e. **bodily injury** or **property damage** arising out of a premises:

    (1) owned by an **insured;**

    (2) rented to an **insured;** or

    (3) rented to others by an **insured;**

that is not an **insured location.**

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured.**

f. **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of:

    (1) motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment:

    (2) trailers, semi-trailers or mobile homes:

which are owned or operated by or rented or loaned to an **insured.**

However, this exclusion does not apply to:

    (1) motor vehicles which are not subject to motor vehicle registration and are:

        (a) used for assisting the handicapped.

        (b) used to service an **insured location.**

        (c) golf carts while on the **residence premises** or used for golfing purposes.

        (d) designed and used for recreational purposes, and are:

            (i) not owned by an **insured;** or

            (ii) owned by an insured while on the **residence premises.**

        (e) in dead storage on the **residence premises.**

        (f) used exclusively on the **residence premises.**

    (2) trailers or semi-trailers while not being towed by or carried on a motor vehicle.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employees** employment by an **insured.**

g. **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of watercraft:

    (1) with inboard or inboard-outdrive motor power of more than 50 horsepower owned by or rented to an **insured.**

    (2) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured.** But, outboard motors of more than 25 total horsepower are covered for the policy period if:

        (a) you acquire them prior to the policy period and:

            (i) you declare them at policy inception; or

            (ii) your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors.

        (b) you acquire them during the policy period.

    (3) that is a sailing vessel, with or without auxiliary power, which is 26 feet or more in length owned by or rented to an **insured.**

This exclusion does not apply while the watercraft is on the **residence premises.**

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

h. **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of aircraft.

Aircraft means any device used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

j. **bodily injury** or **property damage** caused directly or indirectly by war. This includes undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and any consequence of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

k. **bodily injury** or **property damage** arising out of the transmission of sickness or disease by an **insured** through sexual contact.

l. **bodily injury** to any person eligible to receive any benefits voluntarily provided or required to be provided by an **insured** under any workers' compensation law or occupational disease law.

2. **Coverage C (Personal Liability)** does not apply to:

a. liability under any contract or agreement.

However, this exclusion does not apply to written contracts:
   (1) that directly relate to the ownership, maintenance or use of an **insured location;** or
   (2) where the liability of others is assumed by an **insured;**
     unless excluded elsewhere in this policy.

b. **property damage** to property owned by an **insured.**

c. **property damage** to property rented to, occupied or used by or in the care of an **insured.**

This exclusion does not apply to **property damage** caused by fire, smoke or explosion.

d. **bodily injury** or **property damage** for which an **insured** under this policy is also an insured under a nuclear energy liability policy or would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by American Nuclear Insurers, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada.

e. **bodily injury** to you or an **insured** within the meaning of part a. or part b. of **insured** as defined.

3. **Coverage D (Medical Payments to Others)** does not apply to:

a. **bodily injury** to a **residence employee** if the **bodily injury:**

   (1) occurs off the **insured location;** and
   (2) does not arise out of or in the course of the **residence employee's** employment by an **insured.**

b. **bodily injury** to any person, other than a **residence employee** of an **insured,** regularly residing on any part of the **insured location.**

## SECTION II ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

a. expenses we incur and costs taxed against an **insured** in any suit we defend.

b. premiums on bonds required in a suit we defend but not for bond amounts more than the limit of liability for Coverage C (Personal Liability). We need not apply for or furnish any bond.

c. reasonable expense incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit.

d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **Imperative Medical Expenses to Others.** We pay expenses incurred by an **insured** for immediate medical and surgical relief to others if imperative at the time of the accident.

3. **Damage to Property of Others.** We pay replacement cost up to $500 per **occurrence** for **property damage** to property of others caused by an **insured.**

We do not pay for **property damage:**

a. caused intentionally by an **insured** who is 13 years of age or older.

b. to property owned by an **insured.**

c. to property owned by or rented to a tenant of an **insured** or a resident in your household.

d. arising out of:

(1) a **business** engaged in by an **insured.**

(2) any act or omission in connection with a premises owned, rented or controlled by an insured, other than the **insured location.**

(3) the ownership, maintenance, use, loading or unloading of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

This exclusion does not apply to any motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **insured.**

## SECTION II CONDITIONS

1. **Limit of Liability.** The limit of liability for Coverage C (Personal Liability) shown on the declarations page is our total liability under Coverage C (Personal Liability) for all damages resulting from any one **occurrence.** This limit is the same regardless of the number of **insureds,** claims made or persons injured.

The limit of liability for Coverage D (Medical Payments to Others) shown on the declarations page is our total liability under Coverage D (Medical Payments to Others) for all medical expense payable for **bodily injury** to one person as the result of one accident. The total limit of our liability for all expenses payable to two or more persons injured in one accident is $25,000.

2. **Severability of Insurance.** This insurance applies separately to each **insured.** This condition will not increase our limit of liability for any one **occurrence.**

3. **Duties After Loss.** In case of an accident or **occurrence,** the **insured** will perform the following duties that apply or will help us by seeing that these duties are performed:

a. Give written notice to us or our agent as soon as is practical, which sets forth:

(1) the identity of the policy and **insured.**

(2) reasonably available information on the time, place and circumstances of the accident or **occurrence.**

(3) names and addresses of any claimants and witnesses.

b. Promptly forward to us every notice, demand, summons or other process relating to the accident or occurrence.

c. At our request, help us:

(1) to make settlement.

(2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured.**

(3) with the conduct of suits, including attending hearings and trials.

(4) to secure evidence and obtain the attendance of witnesses.

d. The **insured** will not, except at the **Insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for immediate medical and surgical relief to others at the time of the **bodily injury.**

4. **Duties of an Injured Person - Coverage D (Medical Payments to Others).**

The injured person or someone acting for the injured person will:

a. give us written proof of claim, under oath if required, as soon as is practical.

    b. authorize us to obtain copies of medical reports and records.

    The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim - Coverage D (Medical Payments to Others).** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

    No one will have the right to join us as a party to any action against an **insured.** Also, no action with respect to Coverage C (Personal Liability) can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement.

    Under Coverage D (Medical Payments to Others), no action can be brought until 30 days after the required proofs of claim have been filed with us.

7. **Bankruptcy of the Insured.** Bankruptcy or insolvency of the **insured** or of the **insured's** estate will not relieve us of our obligations under this policy.

8. **Other Insurance - Section II.** If the **insured** has other insurance under Coverage C (Personal Liability), we will not be liable for a greater proportion of a loss than the limit of liability shown on the declarations page bears to the total limit of all valid and collectible insurance against such loss.

    However, with respect to loss arising out of the ownership, maintenance, operation, use, loading or unloading of:

    a. any motor vehicle or recreational motor vehicle at the **residence premises;** or
    b. watercraft.
    this policy will not apply to the extent that any valid and collectible insurance is available to the **insured.**

9. **Notice of Settlement of Liability Claim.**

    a. We will notify the **insured** in writing of any initial offer to compromise or settle a claim against the **insured** under the liability section of this policy. We will give the **insured** notice within 10 days after the date the offer is made.

    b. We will notify the **insured** in writing of any settlement of a claim against the **insured** under the liability section of this policy. We will give the insured notice within 30 days after the date of the settlement.

## SECTION I AND II CONDITIONS

1. **Policy Period.** This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II which occurs during the policy period stated on the declarations page.

2. **Concealment or Fraud.** This policy is void as to you and any other **insured,** if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance, made false statements or committed fraud relating to this insurance, whether before or after a loss.

3. **Liberalization Clause.** If the State Board of Insurance adopts a revision which would broaden or extend the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened or extended coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions.** Changes in this policy may be made and perils added only by attaching a written endorsement properly executed by our authorized agent. No provision of this policy may be waived unless the terms of this policy allow the provision to be waived. Our request for an appraisal or examination will not waive any of our rights.

5. **Cancellation:**

    a. You may cancel this policy at any time by notifying us of the date of cancellation is to take effect. We will send you any refund due when the policy is returned to us.

    b. We may cancel this policy for the reasons stated in this condition by mailing you notice in writing of the date cancellation takes effect.

(1) If this policy has been in effect for less than 90 days and is not a renewal policy, we may cancel this policy for any reason.

The effective date of cancellation cannot be before:

(a) the 10th day after we mail notice if we cancel for non-payment of premium.

(b) the 30th day after we mail notice if we cancel for any other reason.

(2) If this policy has been in effect 90 days or more, we may not cancel this policy unless:

(a) you do not pay the premium or any portion of the premium when due.

(b) the State Board of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.

(c) you submit a fraudulent claim.

(d) there is an increase in the hazard covered by this policy that is within your control and that would produce an increase in the premium/rate of this policy.

The effective date of cancellation cannot be before the 10th day after we mail the notice. Our notice of cancellation must state the reason for cancellation.

c. If we cancel, our notice to you will state that if this refund is not included with the notice, it will be returned on demand.

d. We may not cancel this policy solely because you are an elected official.

6. **Refusal to Renew.**

a. We may not refuse to renew this policy because of claims for losses resulting from natural causes.

b. We may not refuse to renew this policy solely because you are an elected official.

c. We may refuse to renew this policy if you have filed three or more claims under the policy in any three year period that do not result from natural causes.

If you have filed two claims in a period of less than three years, we may notify you in writing, that if you file a third claim during the three year period, we may refuse to renew this policy by providing you proper notice of our refusal to renew as provided in d. below. If we do not notify you after the second claim, we may not refuse to renew this policy because of losses.

A claim does not include a claim that is filed but is not paid or payable under the policy.

d. If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown on the declarations page and any mortgagee named on the declarations page, written notice of our refusal to renew not later than the 30th day before the date on which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss, all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us. If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If the named insured dies, we insure:

a. the named insured's spouse, if a resident of the same household at the time of death.

b. the legal representative of the deceased. However, if this legal representative was not an **insured** at the time of death of the named insured, this policy will apply to such legal representative only with respect to the premises of the original named insured.

c. any person who is an **insured** at the time of such death, while a resident of said premise.

**Prescribed by the Texas Department of Insurance**
**Homeowners Tenant Form B - Effective July 8, 1992**
**(Revised January 1 ,1996)**

FIRE INSURANCE EXCHANGE, LOS ANGELES, CALIFORNIA
A Reciprocal Company
15700 Long Vista Dr.  Austin, TX 78728

**DECLARATIONS PAGE**
TEXAS HOMEOWNERS
POLICY FORM - B

| | POLICY PERIOD | | | | |
|---|---|---|---|---|---|
| **POLICY NUMBER** | **EFFECTIVE DATE** | **EXPIRATION DATE** | | | |
| 96280-52-77 | 09-21-2012 | 09-21-2013 | | | |

AT 12:01 A.M. STANDARD TIME AT THE LOCATION OF THE RESIDENCE PREMISES/DWELLING

☐ NEW   ☐ RENEWAL

☒ AMENDED-DATE
09-21-2012

NAMED INSURED/MAILING ADDRESS:
MIKE HOOD

1115 GOLDEN GATE DR
CARROLLTON TX  75007-5059

MORTGAGEE OR OTHER INTEREST:

| LOAN NUMBER |
|---|
| |

| PROTECTION CLASS | CITY LIMIT (INSIDE/OUTSIDE) |
|---|---|
| 03 | INSIDE |

| CONSTRUCTION TYPE |
|---|
| FRAME W/>50% MASONRY VENEER |

RESIDENCE PREMISES/DWELLING  1115 GOLDEN GATE DR
Lot-Block-Addition          CARROLLTON TX  75007-5059

| | SECTION I - PROPERTY COVERAGES (Limit of Liability) | | | | SECTION I - Paragraph 2 | BASIC PREMIUM |
|---|---|---|---|---|---|---|
| | COVERAGE A | | COVERAGE B | | | |
| | DWELLING | OTHER STRUCTURES | PERSONAL PROPERTY | PERS. PROP. OFF PREMISES | LOSS OF USE | |
| | NOT COV | NOT COV | $50,000 | $5,000 | $10,000 | |
| PREMIUM | | | INCLUDED | XXXXXXXXXX | XXXXXXXXXX | $284.00 |

| | SECTION II - LIABILITY COVERAGES (Limit of Liability) | | | PREMIUM |
|---|---|---|---|---|
| | COVERAGE C | COVERAGE D | INCREASED LIABILITY LIMITS | |
| | PERSONAL LIABILITY (Each Occurrence) | MEDICAL PAYMENTS TO OTHERS (Each Person) | | |
| | $500,000 | $500 | XXXXXXXXXX | |
| PREMIUM | INCLUDED | INCLUDED | $15.00 | $15.00 |

| PREMIUM | OTHER RESIDENTIAL PREMISES-LOCATION: | INCLUDED |
|---|---|---|

OTHER COVERAGES AND ENDORSEMENTS (Endorsement No. and Title)

| ENDT. NO. | DESCRIPTION | LIMIT OF LIAB. | PREMIUM |
|---|---|---|---|
| TX099 | TEXAS AMENDATORY INFORMATION ENDORSEMENT | | |
| TX102 | Endorsement Amending Section I - Exclusions | N/A | INCL |
| TX182 | ENDORSEMENT AMENDING SECTION I AND II - CONDITIONS | | |
| HO101 | REPLACEMENT OF PERSONAL PROPERTY | $ | 68.00 |
| TX122 | TX ENDORSEMENT AMENDING SECTION I AND II-CONDITIONS | | |

OTHER COVERAGES, LIMITS AND EXCLUSIONS APPLY - REFER TO YOUR POLICY

| DEDUCTIBLES (SECTION I ONLY) | AMOUNT OF DEDUCTIBLE | DEDUCTIBLE ADJUSTMENT PREMIUM |
|---|---|---|
| DEDUCTIBLE CLAUSE 1 | NIL | |
| DEDUCTIBLE CLAUSE 2 | NIL | |
| DEDUCTIBLE CLAUSE 3 | $500 | |
| TOTAL POLICY PREMIUM   INSURED PAYS | XXXXXXXXXX | $367.00 |

| AGENT: | ANN MCBRIDE | | |
|---|---|---|---|
| AGENCY ADDRESS AT: | 14465 WEBB CHAPEL#205 DALLAS TX 75234 - | AGENT NUMBER: AGENT PHONE: | 35 90 378 (972) 241-7766 |

56-5291  4TH EDITION 9-09   96280-52-77          (Continued on Reverse Side)          10-01-2012          (5291411)

**TEXAS HOMEOWNERS POLICY**
**RECIPROCAL POLICY CONDITIONS**

**(Applicable only if policy is issued by the Fire Insurance Exchange or Farmers Insurance Exchange)**

This policy is made and issued in consideration of your premium payment to us. It is also issued in consideration of the information you gave to us during the application process, some of which is set out in the policy Declarations, and in consideration of the Subscription Agreement, which is provided to you and is incorporated herein by reference. You acknowledge that you have read, understood and agree to all the terms and conditions of the Subscription Agreement. Among other things, the Subscription Agreement appoints your Attorney-in-Fact, authorizes your Attorney-in-Fact to execute interinsurance policies between you and other subscribers and to perform various functions, and addresses compensation of the Attorney-in-Fact.

Nothing in this policy is intended, or shall be construed, to create either:

a. A partnership or mutual insurance association; or

b. Any joint liability.

We may sue or be sued in our own name, as though we were an individual, if necessary to enforce any claims which arise under this policy. In any suit against us, service of process shall be upon the Attorney-in-Fact as shown in your Subscription Agreement.

Membership fees which you pay are not part of the premium. They are fully earned when you are granted membership and coverage is effective. They are not returnable. However, they may be applied as a credit to membership required of you for other insurance which we agree to write.

We hold the Annual Meeting of the members of the Fire Insurance Exchange at our Home Office at Los Angeles, California, on the first Monday following the 15th day of March of each year at 10:00 a.m. If this policy is issued by Farmers Insurance Exchange, we hold such meeting at the same place on the same day each year at 2:00 p.m.

The Board of Governors may elect to change the time and place of the meeting. If they do so, you will be mailed a written or printed notice at your last known address at least ten (10) days before such a time. Otherwise, no notice will be sent to you.

The Board of Governors shall be chosen by subscribers from among yourselves. This will take place at the Annual Meeting or at any special meeting which is held for that purpose. The Board of Governors shall have full power and authority to establish such rules and regulations for our management as are not inconsistent with the subscribers' agreements.

Your premium for this policy and all payment made for its continuance shall be payable to us at our

Home Office or such location named by us in your premium notice.

The funds which you pay shall be placed to your credit on our records. They will be applied to the payment of your proportion of losses and expenses and to the establishment of reserves and general surplus. The Board of Governors or its Executive Committee has the authority to deposit, withdraw, invest and reinvest such funds. You agree that any amount which the Board of Governors allocates to our surplus fund may be retained by us. Also, after provision is made for all of our liabilities, it may be applied to any purpose deemed proper and advantageous to you and other policyholders. This policy is non-assessable.

TEXAS FARMERS INSURANCE COMPANY

FIRE INSURANCE EXCHANGE
by Fire Underwriters Association, Attorney-in-Fact

FARMERS INSURANCE EXCHANGE
by Farmers Underwriters Association, Attorney-in-Fact

MID-CENTURY INSURANCE COMPANY

Secretary                                           Vice-President

## ENDORSEMENT AMENDING SECTION I AND II - CONDITIONS

**TX182**
**TEXAS**
**1st Edition**

Under **SECTION I AND II - CONDITIONS**, it is agreed that the following are added:

**Additional Benefits and Services.**

We may work with independent merchants for enhanced value for replacement of your property. We may also work with independent merchants for other services, discounts or benefits. We may introduce you to these merchants and if you are interested in any of the services, discounts, or benefits that they may offer, you will have to deal directly with them. You do not have to use their services. You do not have to accept any discounts or benefits that they may offer to you. We do not make any representation regarding the suitability of any such services, discounts or benefits for your specific needs. We are not obligated to expand or continue to make available any such services, discounts or benefits.

**Policy Notices.**

Notwithstanding any policy provision which states where a policy notice will be addressed, we will address policy notices to you at your last mailing address known to us. We may mail or, unless prohibited by law, deliver such notices to you. If a mortgagee is named in this policy, any notices we give to the mortgagee may be mailed or delivered.

However, when mailed, we or vendors we retain may forward or address such notices to an updated address per any change of address presented to or filed with the United States Postal Service. In addition, we may update our policy records to reflect this updated address and/or address future policy notices to this address.

Except where prohibited by law, a policy notice under this Policy Notices condition will be deemed "mailed" or "delivered" if it is delivered by electronic transmittal or facsimile.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.

94-2458 1ST EDITION 2-11                                                    W2458I01

## ENDORSEMENT AMENDING SECTION I AND II - CONDITIONS
### (For use with HO-A, HO-B-CON and HO-BT)

TX**122**
1st Edition

Under **SECTION I AND II - CONDITIONS**, Item 5, **Cancellation,** has been deleted in its entirety and replaced with the following:

5. **Cancellation**

  a. You may cancel this policy at any time by notifying us of the date cancellation is to take effect. We will send you any refund due when the policy is returned to us.

  b. If this policy has been in effect for less than 60 days and is not a renewal policy we may cancel this policy if:

    (1) we identify a condition that:
      (a) creates an increased risk of hazard;
      (b) was not disclosed in the application for insurance coverage; and
      (c) is not the subject of a prior claim; or
    (2) before the effective date of the policy, we have not accepted a copy of a required inspection report that:
      (a) was completed by an inspector licensed by the Texas Real Estate Commission or who is otherwise authorized to perform inspections; and
      (b) is dated not earlier than the 90th day before the effective date of the policy.

      An inspection report is deemed accepted, unless we reject it before the 11th day after the date we receive it.

  c. We may also cancel this policy at any time for any of the following reasons:

    (1) you do not pay the premium or any portion of the premium when due.
    (2) the Department of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.
    (3) you submit a fraudulent claim.
    (4) there is an increase in the hazard covered by this policy that is within your control and that would produce an increase in the premium/rate of this policy.

  d. The effective date of cancellation cannot be before the 10th day after we mail the notice if we cancel for any of the reasons in c. or the 30th day after we mail notice if we cancel for any other reason. Our notice of cancellation must state the reason for cancellation.

  e. If we cancel, our notice to you will state that if the refund is not included with the notice, it will be returned on demand.

  f. We may not cancel this policy solely because you are an elected official.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.

# ENDORSEMENT ADDING DEFINITIONS AND
# AMENDING SECTION I - EXCLUSIONS
## (For use with HO-BT)

**TX102**
**1st Edition**

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

THIS ENDORSEMENT AMENDS THE HO-BT POLICY FORM BY ADDING DEFINITION 10, UNDER **DEFINITIONS** AND BY DELETING **SECTION I - EXCLUSIONS**, EXCLUSION 6 IN ITS ENTIRETY AND BY REPLACING IT WITH THE FOLLOWING:

Under **DEFINITIONS**, the following definition 10, is added:

10. **Remediation** means to treat, contain, remove or dispose of mold, fungi or other microbes beyond that which is required to repair or replace the covered property physically damaged by water or steam. **Remediation** includes any testing to detect, measure or evaluate mold, fungi or other microbes and any decontamination of the **residence premises** or property.

Under **SECTION I - EXCLUSIONS**, exclusion 6 is deleted in its entirety and replaced with the following new exclusion:

6. **MOLD, FUNGI OR OTHER MICROBES**

   a. We do not cover loss caused by or resulting from mold, fungi, or other microbes, including:
      i) the cost for **remediation** for mold, fungi or other microbes;
      ii) any increase in expenses for Loss of Use and/or Debris Removal due to **remediation** for mold, fungi or other microbes.

   b. The physical presence of mold, fungi or other microbes on that portion of covered property which must otherwise be repaired or replaced because of direct physical loss caused by water or steam damage covered under this policy shall not result in the exclusion of such covered water or steam damage loss.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.

94-0509 1ST EDITION 3-03                                                W0509101

**THIS PAGE LEFT
INTENTIONALLY BLANK.**



**ENDORSEMENT NO. HO-101**
Effective
October 2, 1993

# REPLACEMENT OF
# PERSONAL PROPERTY

## SECTION I PROPERTY COVERAGE

For an included additional premium, our limit of liability and payment for covered loss to:

1. personal property; and
2. wall-to-wall carpeting and cloth awning (Forms HO-B & HO-C only);

is extended to include Replacement Cost. Replacement Cost means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following:

    a. the Coverage B (Personal Property) limit of liability;

    b. the replacement cost at the time of loss;

    c. for property that is repairable, the cost of repair with material of like kind and quality with no deduction for depreciation; or,

    d. the interest of the **insured**.

**We do not pay replacement cost for:**

    a. property which cannot be replaced.

    b. property not maintained in good or workable condition.

    c. property that is either obsolete or useless to the **insured** at the time of loss.

    d. watercraft including outboard motors for any replacement cost in excess of $2,500.

        We will pay replacement cost of watercraft including outboard motors up to a limit of $2,500.

    e. **Property that is not repaired or replaced.**

**Loss Settlement:**

    a. We will pay you:

        1. the replacement cost of your damaged property up to $1,500; and

        2. the actual cash value of your remaining damaged property

          within 5 business days after we notify you that we will pay the claim.

          If you repair or replace the damaged property, you may make claim for reimbursement on a replacement cost basis for the replacement cost of your property exceeding $1,500. You must repair, restore or replace the property within 365 days after the loss. Reimbursement will be made within 5 business days after we receive proof that the property has been repaired, restored or replaced.

    b. In lieu of (a.) above, we may offer and you may accept or reject our offer to provide a replacement item of like kind and quality for your damaged property.

**Prescribed by the State Board of Insurance**
**Endorsement No. HO-101 - Replacement of Personal Property**
**Effective October 2, 1993**

97-0015 8-97　　　　　　　　　　　　　　　　　　　　　　　　H-97　　　　　　　V0015101